## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | )     CR 10-49 Erie |
| | ) |
| HUGO LOPEZ, | ) |
| | ) |
| Defendant. | ) |

## OPINION

On August 17, 2010, Defendant Hugo Lopez was charged in a two-count Indictment with possession of ammunition by a convicted felon, in violation of 18 U.S.C. § 922(g)(1) (Count I), and possession of ammunition by a drug user or addict, in violation of 18 U.S.C. § 922(g)(3) (Count II). Presently before the Court is Defendant's "Motion to Suppress Evidence" (Doc. No. 34). On October 4, 2011, we held a hearing on the motion and took the matter under advisement. A transcript of the suppression hearing was prepared.

For the reasons that follow, said motion is denied.

## I. BACKGROUND

Unless otherwise noted, the following facts are undisputed.

On August 2, 2010, Special Agent Kirk R. Brace of the Federal Bureau of Investigation obtained a Search and Seizure Warrant approved by U.S. Magistrate Judge Susan Paradise Baxter which authorized the search of an apartment located at 702 West 16th Street in Erie, Pennsylvania. The basis for the search warrant was evidence obtained by the FBI while investigating a bank robbery and armed bank robbery, in violation of 18 U.S.C. §§ 2113 (a) and (d).

1

## A. Affidavit in Support of Search Warrant

The affidavit supporting the search warrant (Defendant's Motion to Suppress Exhibit C), (Doc. 34-4) stated the following. On June 24, 2010, the Northwest Savings Bank located at 2256 West Eighth Street in Erie, Pennsylvania was robbed by a man brandishing a handgun, who was later described as Hispanic or Puerto Rican in his thirties, with a thin to medium build standing 5'5" or 5'6", with slightly graying, black, close-cut hair. Several days later, an anonymous caller told the Millcreek Police Department that the robber was "Hugo." The anonymous caller explained that Hugo had been bragging about plans to rob another bank on Peach Street, and after stating this intention, on June 1, 2010, a bank on Peach Street was robbed. The caller further explained that after the Peach Street robbery, Hugo also bragged that he was going to rob another bank, and shortly after bragging thus, the Northwest Savings Bank robbery occurred on June 24, 2010.

After the Northwest Savings Bank robbery, Special Agent Brace circulated bank surveillance photographs of the robbery to law enforcement agencies, and on June 28, 2010, Agent Heather Dunkle of the Pennsylvania Attorney General's Bureau of Narcotics Investigation showed the photos to a confidential informant (CI), who has a prior felony drug conviction and had provided information leading to successful undercover drug purchases by law enforcement, as well as information, confirmed to be truthful, concerning his/her own illegal activity relevant to a pending investigation. The CI identified the person in the surveillance photographs as "Juice," later explaining that s/he remembered that Juice's real name is Hugo, and that he was called "Juice" because "Hugo" is the Spanish word for "juice."

Upon receipt of this information, Special Agent Brace shared it with the Erie Police Department, who checked law enforcement databases and determined that defendant herein,

Hugo Lopez, has the nickname "Juice." Special Agent Brace gave a copy of Hugo Lopez's Pennsylvania Identification Card photograph to Agent Dunkle, who in turn showed the photograph to the CI. The CI said the photograph of Hugo Lopez was the person s/he knew as "Juice", and the same person he had identified in the bank robbery surveillance photographs the previous day. Agent Dunkle had indicated to Special Agent Brace that she believed the CI to be a reliable source because the CI (who had a previous felony drug conviction) had provided information which had led to a number of successful undercover drug purchases.

The following day, June 30, 2010, a contributor of information (COI), who had pending theft charges and sought reward money, told Special Agent Brace that on June 24, 2010, the day of the Northwest Savings Bank robbery, the COI's neighbor, P.N., told COI that if s/he wanted to make some money, s/he should watch who P.N. brings home and then watch the 11:00 p.m. news. Later that day, the COI saw a man s/he knew as "Juice" at P.N.'s residence. Later, s/he watched the news and saw the bank robbery surveillance photographs, the COI realized that "Juice" was the man in the photographs. Special Agent Brace showed the COI the bank surveillance photographs from the Northwest Savings Bank robbery and the COI identified the bank robber as "Juice." Special Agent Brace then showed the COI Hugo Lopez's Pennsylvania Identification Card photograph and the COI identified Hugo Lopez as "Juice."

In addition, the COI told Special Agent Brace that P.N. had said that "Juice" had a haircut prior to the robbery, that "Juice" was mad at himself for forgetting to put his hat on before the entered the bank, that "Juice" was connected to two bank robberies from which he obtained roughly $30,000, and that "Juice" was talking about getting out of town, first to Florida and then to Puerto Rico. The COI told Special Agent Brace that "Juice" is a heroin addict, and that "Juice" speaks English with a Hispanic accent.

3

On June 30, 2010, a third bank robbery occurred at the PNC Bank at 1914 East 38th Street in Erie, Pennsylvania. The robber was described by a bank teller as Hispanic with a heavy Hispanic accent, who brandished a handgun, and was seen leaving the area in an older model, rusting, green Ford Explorer with "Eddie Bauer" written on the side of the vehicle.

Minutes after the PNC Bank robbery, K.L. reported to Erie Police Department that her green Eddie Bauer edition Ford Explorer had been stolen. After investigating further, law enforcement determined that K.L.'s boyfriend, Angel Lebron, a fugitive who had been in control of the vehicle for the previous two months, had told her to report the vehicle stolen. The investigation also disclosed that "Juice" was one of Lebron's associates. K.L. recalled witnessing Lebron talking with "Juice" on the phone.

On August 1, 2010, Hugo Lopez's landlord at 702 West 8th Street in Erie, Pennsylvania, second floor rear apartment, contacted Special Agent Brace to report that Mr. Lopez had paid him $100 toward his August rent after having stated his intention to leave town within the next few days. The landlord reported that a man named "Angel", an escaped fugitive who had just turned himself into police, had been living with Mr. Lopez. The landlord had been told by another tenant that "Angel" had been supplying money to Hugo Lopez for rent and that Angel's turning himself into the police was the impetus for Hugo Lopez's decision to move out of his apartment, which was one of four apartments in the building.

The search warrant was obtained and executed the following day, August 2, 2010. It authorized the search of Mr. Lopez's apartment.

## B. Testimony at Hearing

At a hearing on the motion to suppress, we heard testimony from three witnesses: the defendant, Special Agent Brace, and Special Agent Jason Crouse.

4

At the beginning of the search, at approximately 2:45 p.m., Mr. Lopez was not home. As he returned home, Mr. Lopez walked toward Special Agent Crouse, who was standing outside the residence. Special Agent Crouse asked if he could talk to Lopez, who agreed. Mr. Lopez at first assumed that the search was related to suspected drug activity. Special Agent Crouse asked Mr. Lopez if he could pat him down, and Mr. Lopez agreed. Special Agent Crouse testified that the pat down was conducted out of concern for the safety of the agents executing the search warrant. Nothing was found during the pat down. Special Agent Crouse explained to Mr. Lopez that the case agent in charge of the search was in the apartment and would answer Mr. Lopez's questions.

A few minutes later, Special Agent Brace came out of the residence to speak with Mr. Lopez, and advised him that a search was being conducted of his residence pursuant to a search warrant. Mr. Lopez was told that he was not under arrest, and Special Agent Brace asked if he could interview him. Mr. Lopez again agreed but told Special Agent Brace that he had to go to work soon. He expressed displeasure and was concerned because the person who was to drive him to work had just dropped him off. At Mr. Lopez's request, Special Agent Brace agreed to drive Mr. Lopez to work. Mr. Lopez called his employer to tell him he would be late for work.

During the interview, Mr. Lopez made incriminating statements, including that there was a case of .32 caliber ammunition in his bedroom. (The agents found a box, not a case, of ammunition.) He told the agents that he had found the ammunition and that he had taken it into his apartment and planned to sell it.

During this initial questioning, Mr. Lopez was never restrained or handcuffed, or told that he was not free to leave. Weapons were never drawn, and he was never told that he was under arrest. He never asked to if he could leave. However, he was not permitted to go into the

5

apartment while the search was conducted. He did not ask if he could stop answering questions. According to the agents, during the search, there were anywhere from two to four agents milling about. Mr. Lopez was never told that because they had obtained a search warrant Mr. Lopez had to answer questions. Mr. Lopez's demeanor was described as coherent. The agents testified that he did not appear to be under the influence of any drugs. He was also described as being very cooperative. For a period of time Mr. Lopez sat on the concrete stoop while Special Agent Brace squatted in front of him and asked questions. Special Agent Brace testified that had Mr. Lopez chosen to leave, he would not have stopped him, even though the bullets had already been discovered in his residence.

Because Mr. Lopez has a prior felony conviction which prohibits him from legally possessing ammunition, upon making the statement that he had ammunition under his bed, Mr. Lopez was arrested, handcuffed, and transported to the FBI office in Erie, Pennsylvania. While there, according to the agents, Mr. Lopez told them that he had used heroin a couple of hours prior, but that he nevertheless was aware of what he was saying and doing. Mr. Lopez executed the Advice of Rights form (Government's Ex.1) stating that he understood his Miranda rights but that he was willing to answer questions without a lawyer present. The Advice of Rights for indicates that it was executed at 4:34 p.m. Mr. Lopez continued to give incriminating statements during his interview.

Mr. Lopez's testimony, which we found at times to lack credibility, diverged from the agents' testimony in several ways. First, Mr. Lopez testified that he had told the agents at the scene of the search that he had used heroin earlier that day. Specifically, Mr. Lopez testified that he had told them within minutes of arriving at the apartment building that he had used heroin a half hour prior. We find this testimony to lack credibility. The agents both convincingly

6

testified that Mr. Lopez told them he had used heroin only after his arrest and arrival at the FBI office. Both agents testified that Mr. Lopez was coherent and understood what was happening. Furthermore, Mr. Lopez testified that he felt that he was under arrest before he was formally arrested, and that he would not have been able to leave the area. However, we find credence in the agents' testimony that they did not coerce him or act in any way so as to indicate that his freedom was restricted. Mr. Lopez admitted to signing the waiver or rights form, but denied having read it. We find this testimony to lack credibility. Mr. Lopez's initials appear to the left of each of the eight lines on the form. Special Agent Brace credibly testified that he had explained his rights and that Mr. Lopez appeared to have understood those rights.

## II. DISCUSSION

Defendant argues that all physical evidence seized and incriminating statements made by him during the search of his residence should be suppressed because the affidavit accompanying the warrant did not establish probable cause to search the apartment. Defendant argues that the information provided by the anonymous source, the CI and the COI was insufficiently reliable to establish probable cause, and that the agents did not adequately corroborate the information. The Government, in turn, argues not only that the affidavit accompanying the search warrant established the requisite probable cause, but also that even if the warrant was improperly issued, the evidence seized during the search of the his premises should not be suppressed because the FBI agents in good faith relied on a facially valid search warrant. Mr. Lopez further argues that the search warrant did not authorize a search or interrogation of the defendant, and that the FBI agents improperly implied that the search warrant authorized them to search his person and interrogate him. Finally, he argues that his statements and waiver of Miranda rights were not

7

voluntary because the agents coerced him into making statements while he was under the influence of heroin.

## A. Probable Cause Supporting Issuance of Warrant

Under the Fourth Amendment, the government must obtain a warrant prior to searching areas in which an individual possesses a reasonable expectation of privacy. Katz v. United States, 389 U.S. 347, 360, (1967); United States v. Herrold, 962 F.2d 1131, 1136-37 (3d Cir. 1992). It is well-established that "the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." Payton v. New York, 445 U.S. 573, 590 (1980); see also Sharrar v. Felsing, 128 F.3d 810, 819 (3d Cir. 1997). A search warrant, in turn, may only be issued if there is probable cause to believe that evidence of criminal activity will be found on the premises or person to be searched. United States v. Harris, 482 F.2d 1115, 1119 (3d Cir. 1973). The defendant bears the burden of establishing by a preponderance of the evidence that his Fourth Amendment rights were violated. United States v. Acosta, 965 F.2d 1248, 1257 n. 9 (3d Cir. 1992).

It is well established that before issuing a search warrant, the state or magistrate judge must determine that "there is a fair probability that ... evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983). The issuing judge's determination that probable cause existed is to be accorded great deference. Id. at 236; see also United States v. Conley, 4 F.3d 1200, 1205-06 (3d Cir. 1993). Accordingly, "[a] reviewing court must determine only that the [issuing] judge had a 'substantial basis' for concluding that probable cause existed to uphold the warrant." United States v. Whitner, 219 F.3d 289, 296 (3d Cir. 2000). In making this determination, the reviewing court may consider only "the facts that were before the magistrate judge, i.e., the affidavit, and not consider information from other portions of the

8

record." United States v. Jones, 994 F.2d 1051, 1055 (3d Cir. 1993). The warrant's supporting affidavit must be considered as a whole and read in a common sense and nontechnical manner. United States v. Williams, 124 F.3d 411, 420 (3d Cir. 1997).

### 1. Anonymous source

Defendant argues that the affidavit submitted in support of the warrant application did not establish probable cause to issue a warrant for the search of his apartment because the information provided by the anonymous source contained insufficient indicia of reliability, and the investigating officers did not adequately corroborate the anonymous tip. The Government does not dispute that the information provided by the anonymous source alone does not support a determination of probable cause. The Government argues, and we agree, that the investigating agents gathered sufficient corroborating information, including information from the CI and COI, as well as other information contained in the affidavit, reasonably permitted the Magistrate Judge to conclude that the information relevant to the bank robberies could be found at the apartment. The task of the issuing magistrate is to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit there is a fair probability that contraband or evidence of a crime will be found in a particular place. Gates, 462 U.S. at 238-39. Given the totality of the circumstances test set forth in Gates, the anonymous tip (as is true of the information supplied by the CI and COI) was but one piece of the overall puzzle, and there was sufficient reason to conclude that the veracity and basis of knowledge of the person supplying the information supported the decision that there was a fair probability that contraband or evidence of the bank robbery would be found in Mr. Lopez's residence.

### 2. Confidential Informant

Mr. Lopez also argues that the information provided by the CI cannot be used to support probable cause because the veracity of the information was not verified, and the affidavit did not sufficiently state whether the CI's information had proven reliable in the past. Again, under the totality of circumstances standard for evaluating informants' tips when determining if there was probable cause to search, Gates, 462 U.S. at 233, we reject the defendant's arguments. The CI's credibility, reliability, and basis of knowledge were adequately established in the affidavit. The CI's identity was known to the law enforcement at the time s/he proffered the information. The CI had provided information leading to successful undercover drug purchases by law enforcement, as well as information, confirmed to be truthful, concerning his own illegal activity relevant to a pending investigation. The CI was motivated to aid law enforcement agents during the pendency of his/her own criminal prosecution. The information s/he provided was corroborated by the check of law enforcement databases (concerning the defendant's use of the name "Juice"), by the anonymous tip that a man named "Hugo" had robbed the banks, and the CI's confirmation that the photograph of Mr. Lopez was the man the CI knew as "Juice."

### 3. Contributor of Information

Mr. Lopez further argues that the information provided by the COI did not support probable cause because Special Agent Brace did not verify the truth of the information with P.N. We find that the information provided by the COI was consistent with what the FBI had learned from the anonymous source and the CI. The COI told Special Agent Brace that P.N. told the COI that if s/he wanted to get reward money, the COI should watch who P.N. brings home and then watch the 11:00 news. The COI saw a man s/he knows as "Juice" at P.N.'s residence, and when the COI saw the bank robbery surveillance photographs on the evening news, the COI

10

realized that "Juice" was the man in the photographs. When Special Agent Brace showed the COI Mr. Lopez's photograph, the COI identified Mr. Lopez as "Juice." Special Agent Brace need not have verified the information with P.N. because it was consistent with the information Special Agent had obtained from other sources. P.N. had told the COI that "Juice" had a haircut prior to the robbery and was mad at himself because he forgot to put his hat on before he entered the bank, that "Juice" was talking about leaving Erie, and that "Juice" was connected to two bank robberies. The COI told Agent Brace that "Juice" was a heroin addict with a Hispanic accent. The bank robber was described by witnesses as a Hispanic man with a Hispanic accent who was not wearing a hat.

### 4. Landlord and Vehicle

Finally, the defendant argues that the information provided by the defendant's landlord and the owner of the Green Ford Explorer was exculpatory as to the defendant and therefore, fails to establish probable cause that the defendant committed a crime. In particular, the landlord had informed police that Mr. Lopez was moving out of his apartment – not to flee detection after robbing the banks – but because Angel Lebron, who had been providing money to Mr. Lopez for rent, had been arrested after turning himself in to police less than twelve hours after the final bank robbery. Defendant argues that a reasonable person would conclude that it was Angel Lebron, not Mr. Lopez, who had robbed the banks. We find that the information, albeit exculpatory, corroborates the information from the COI that "Juice" was planning to leave town, and is inculpatory insofar as it established a connection between Mr. Lopez and Angel Lebron.

Moreover, the defendant argues that the owner of the Ford Explorer asserted that Angel Lebron was in possession of the vehicle used in the final bank robbery for roughly two months prior to that crime, and that Angel Lebron had induced the owner to file a police report that the

11

vehicle was stolen shortly after the robbery occurred. However, the agents determined that Mr. Lopez and Angel Lebron were associates.

Considering the totality of the circumstances, there was probable cause to search Mr. Lopez's residence. Magistrate Judge Baxter had a "'substantial basis' for concluding that probable cause existed." Whitner, 219 F.3d at 296. Accordingly, the Court concludes that the issuance of a search warrant for the residence did not violate Mr. Lopez's Fourth Amendment rights.

Even if the she had not had a substantial basis for concluding that probable cause existed to search the premises, the Court finds that the agents nonetheless acted in good faith reliance on a facially valid search warrant. Evidence that is seized pursuant to a search warrant issued without probable cause may nonetheless be admissible if the warrant is facially valid and the police officers executing the search relied on it in objective good faith. United States v. Leon, 468 U.S. 897, 922 (1984). "[S]earches pursuant to a warrant will rarely require any deep inquiry into reasonableness, ... for a warrant issued by a magistrate [or state judge] normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search." Id. The United States Court of Appeals for the Third Circuit has concluded that an officer's reliance on a facially valid warrant is unreasonable only in the following four narrow situations:

(1) when the [issuing] judge issued the warrant in reliance on a deliberately or recklessly false affidavit;

(2) when the magistrate judge abandoned his judicial role and failed to perform his neutral and detached function;

(3) when the warrant was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; or

(4) when the warrant was so facially deficient that it failed to particularize the place to be searched or the things to be seized.

United States v. Ninety-Two Thousand Four Hundred Twenty-Two Dollars, 307 F.3d 137, 146 (3d Cir. 2002), quoting United States v. Williams, 3 F.3d 69, 74 n. 4 (3d Cir. 1993). Here, Defendant argues that the affidavit accompanying the search warrant was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable. We find, however, that even if the facts on which the warrant was based were insufficient to establish a substantial basis for concluding that probable cause existed, the search warrant was not "based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." Id.

## B. The Pat Down and Statements Made Pre-Miranda

The admissibility of the statements made to the agents prior to the administration of any Miranda warnings turns on whether Mr. Lopez was in custody at the time he made those statements.

Ordinarily, in determining whether an individual is in custody, the ultimate inquiry is "whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." California v. Beheler, 463 U.S. 1121, 1125 (1983), quoting Oregon v. Mathiason, 429 U.S. 492, 495 (1977) (per curiam). When the individual has not been openly arrested when the statements are made, " 'something must be said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates they would not have heeded a request to depart or to allow the suspect to do so.' " Steigler v. Anderson, 496 F.2d 793, 799 (3d Cir.1974), quoting United States v. Hall, 421 F.2d 540, 545 (2d Cir. 1969).

We find that the interrogation which occurred outside Mr. Lopez's apartment building was not custodial. He was free to leave and voluntarily answered questions and therefore, no Miranda warning was necessary prior to his statement that he had ammunition in his apartment. See Mathiason, 429 U.S. at 495, 97 S.Ct. 711 ("[P]olice officers are not required to administer Miranda warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because ... the questioned person is one whom the police suspect.")

Mr. Lopez was patted down and questioned prior to being arrested, and his consent was freely given. It is well settled that a search conducted pursuant to consent is one of the specifically established exceptions to the search warrant requirement. Schneckloth v. Bustamonte, 412 U.S. 218, 219, (1973). In Schneckloth the Supreme Court stated that voluntariness "is a question of fact to be determined from the totality of all of the circumstances." Id. at 227. Mr. Lopez did not have his freedom of movement restricted in any way. Special Agent Crouse first asked if he could talk to Mr. Lopez and when he agreed, Special Agent Crouse asked if he could pat Mr. Lopez down. Again, Mr. Lopez agreed. Mr. Lopez asked Special Agent Crouse what was happening to which Special Agent Crouse replied that the case agent would explain it to him. Special Agent Brace came out of the residence and advised Mr. Lopez that a search of his residence, pursuant to a warrant, was being conducted. Special Agent Brace told Mr. Lopez that he was not under arrest, and he asked if he could interview him. Mr. Lopez agreed to be interviewed. The questioning lasted a very short period of time, involved no threats or intimidation, and the agents expressed willingness to give Mr. Lopez a ride to work. Mr. Lopez did not appear disoriented or confused and was calm.

Furthermore, we find that the pat down of his person was not a search conducted pursuant to the warrant; rather, it was done for the safety of law enforcement and he consented to it. The

fact that the agents asked questions about items they were searching for does not transform the interview into one conducted pursuant to the authority of the warrant.

## C. **Statements Made Post-Miranda**

The admissibility of the statements made while at the FBI office after the Miranda warning had been given depends on Mr. Lopez's competence at the time to waive his Miranda rights. He argues that he was intoxicated and that the agents coerced him into making the statements. He argues that the FBI should have known that he used heroin prior to their encounter either because – if we are to believe Mr. Lopez – he told them he had used when they were outside his apartment prior to his arrest, or, because the FBI agents knew him to be a heroin addict.

The Supreme Court has frequently articulated the applicable waiver standard. In Miranda v. Arizona, 384 U.S. 436 (1966), the Court held as to waiver and burden:

> The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently.
>
> * * * * * *
>
> If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel. Escobedo v. Illinois, 378 U.S. 478, 490, n. 14, 84 S.Ct. 1758, 12 L.Ed.2d 977 [ (1964) ]. This Court has always set high standards of proof for the waiver of constitutional rights, Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), and we reassert these standards as applied to in-custody interrogation.
>
> Id. at 444, 475.

The Court made clear in Moran v. Burbine, 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410, (1986), the two-pronged test for waiver:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the

15

totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.

Id. at 421 (internal quotations marks and citations omitted).

The United States Court of Appeals for the Third Circuit has also explained that:

This inquiry requires us to consider the totality of the circumstances surrounding the interrogation, which includes examining the events that occurred and the background, experience, and conduct of the defendant. Miranda rights will be deemed waived only where the totality of the circumstances "reveal[s] both an uncoerced choice and the requisite level of comprehension."

United States v. Sriyuth, 98 F.3d 739, 749 (3d Cir. 1996), quoting Moran, 475 U.S. at

421, 106 S.Ct. 1135) (citations omitted).

We find that the defendant knowingly and voluntary waived his privilege against self-incrimination and right to an attorney. United States v. Swint, 15 F.3d 286, 289 (3d Cir. 1994). There is nothing in the record to indicate that the authorities coerced the defendant's statements. Colorado v. Connelly, 479 U.S. 157, 164 (1986). Mr. Lopez told the agents that he had taken heroin a couple of hours prior but that regardless of the heroin use, he was aware of what he was saying and doing. After the waiver form was explained to him, he appeared to understand the terms of the waiver form and initialed it line by line.

## III. CONCLUSION

As the Court concludes that Defendant's Fourth Amendment rights were not violated by the issuance of a search warrant and the voluntary waiver of <u>Miranda</u> rights, and in all other respects was lawful, Defendant's "Motion to Suppress Evidence" is denied.

An appropriate Order will be entered.

Date: _November 22, 2011_

_Maurice B. Cohill, Jr._
Maurice B. Cohill, Jr.
Senior United States District Court Judge